## LUDLAM'S ESTATE.

A specific legacy is the bequest of a particular thing, or money specified and distinguished from all others of the same kind, and which would immediately vest without the assent of the executor. It differs from a general or pecuniary legacy in this respect, that if there be a deficiency of assets, the specific legacy will not be liable to abate; but if the specific legatee be disappointed, by failure of the specific fund, the legatee will not be entitled to any recompense or satisfaction out of the personal estate of the testator.

Where a testator made a bequest as follows: "At and immediately after the decease of my wife, I give unto my nephew, James Ludlam, his executors, &c., one thousand dollars on the books of the loan office, Pennsylvania, as per certificate No. 267," but previous to the death of the testator and after the making of the will, the government paid off the loan, and the testator received the $1000 standing in his name: *Held*, that the legacy was specific, and by the receipt of the money by the testator, it was adeemed. Nor does it make any difference if the receipt of the testator was compulsory, and the state of the fund changed by the act of law, as the time for the payment of the loan having arrived, or by the act of the parties.

The leaning of Courts of Equity is always against regarding legacies as specific; and the inclination is always to hold a legacy general.

There is a class of cases in which the alteration of the fund by the act or operation of law, has been held not to operate as an ademption of a specific legacy.

If an executor has made a mistake by improperly charging himself, when he comes before an auditor on the settlement of his final account, he may be discharged from an erroneous credit given in a former account. The whole account comes before the auditor, both for charge and discharge, under a reference for final settlement, adjustment, and distribution.

The legal presumption is, that his liability is co-extensive with his admissions, but if he can clearly show that he has by mistake surcharged himself with that for which he is not legally liable, or admitted a claim to a legatee, which the latter has no right to claim, it is the duty of the auditor to settle and adjust the account according to the truth and justice of the case.

Although an auditor has been appointed on the application of an executor, and not at the request of a legatee or creditor, and afterwards the legatee appears before the auditor, and at his own request has the account recommitted to that officer, the Court will not then strike off the appointment.

If the legatee intends to object to the reference, he should appear at once, and ask the Court to set aside the appointment; but after having moved a reference back to the auditor, it is too late to complain of any defect in the alleged original appointment.

*Jan.* 29. THIS case came before the Court on exceptions to the report of an auditor. All the facts which gave rise to the questions decided by the Court, are so fully stated in the opinion of the judge who delivered their decision, that it is deemed unnecessary to furnish a more extended statement of them, as it is believed the reader will be fully apprised of all that is material for a just comprehension of the cause.

The cause was argued by Mr. *Waln* for the exceptant, and Mr. *Thomas Dunlap* for the executor.

The following opinion was delivered by

KING, President.—On the 15th of April, 1824, George Ludlam made his last will, in which he bequeathed the rents, issues and profits, interests, dividends, and income of all his estate, real and personal, to his wife, Lydia Ludlam, for life. The second item in his will, under which the question involved in this controversy arises, is in the following words: "At and immediately after the decease of my said wife, I do give and bequeath unto my nephew, James Ludlam, now of Oxford street, London, his executors, administrators, and assigns, eleven shares of stock of the President, Managers, and Company of the Germantown and Perkiomen Turnpike Road; *one thousand* dollars of the United States six per cent. stock or loan of the year 1812, *standing in my name on the books of the loan office*, Pennsylvania, *as per certificate No.* 267; twenty shares of the capital stock of the company for erecting a bridge at or near Trenton; and ten shares of stock in the Philadelphia Insurance Company." The testator died in 1827. Previous to his death, the government of the United States had paid off the loan of 1812, and Mr. Ludlam received the $1000 standing in his name. The money so received by him, Mr. Ludlam handed over to Mr. Matthew L. Bevan, the present executor of his estate, by whom it was paid to the firm of Bevan & Porter, who were Mr. Ludlam's bankers. This money was afterwards paid over to Bevan & Humphreys, who, during the life of Lydia Ludlam, the testator's widow, continued to pay the interest thereon to her.

The first question for decision is, whether the legacy of $1000 government stock was adeemed and extinguished by the receipt of the amount by the testator, when the loan of 1812 was paid off. This depends on the fact of this legacy being general and pecuniary, or specific. If it is specific, it is adeemed and extinguished; if general and pecuniary, it is not. A specific legacy has been defined to be " the bequest of a particular thing, or money, specified and distinguished from all others of the same kind, as of a horse, a piece of plate, *money* in a purse, stock in public funds, a security for money, which would immediately vest without the assent of the executor." It differs from a general or pecuniary legacy in this respect, that if there be a deficiency of assets, the specific legacy will not be liable to abate with the general legacies; and on the

other hand, if such specific legatee be disappointed, as by failure of the specific fund, the legatee will not be entitled to any recompense or satisfaction out of the personal estate of the testator. There is another class of legacies, which the course of the argument for the legatee requires us to notice. These are legacies in the *nature of specific legacies;* as of so much money, with reference to a particular fund for payment. This kind of legacy is so far *general,* and differs so much in effect from a mere specific legacy, that, if the designated fund be called in, or fail, the legatee will not be deprived of his legacy, but be permitted to receive it out of the general assets; yet the legacy is so far specific, that it will not be liable to abate with general legacies upon a deficiency of assets: 1 Roper, 149–50.

That legacies of public or other stocks *may* be specific, is unquestionable. The inquiry in all such cases must be, whether the intention to make them specific is clear; which is certainly requisite to render them so. The intention, however, is generally to be ascertained from the face of the will itself. What kind of expression is sufficiently indicative of such an intention, has frequently engaged the attention of courts, and received their decision. In Bastian *v.* Cooke, 5 Vesey, 461, a testator gave to his son, "John Cowling Barton, £3000 stock in the 3 per cent. consols, bank annuities being part of my stock *now standing in my name,* to be transferred to him by my executors," &c. A question arising whether this legacy was or was not specific, "a great deal," says the master of the rolls, "may be urged as to intention; to show that the testator had no idea of the consequence and nature of a specific legacy. But upon the will and the report, is there any ground to say this is not specific, being clearly so according to every determination on the words?" Again he remarks: "If the testator had sold out part of his stock, the executors would not have had to replace it: *but it would have been adeemed.*" In Norris *v.* Harrison, Madd. Ch. Rep. 280, Am. ed. 487, a bequest of "the *sum* of £11,000 capital bank stock *now standing in my name in the books of the Governor and Company of the Bank of England,* was held by Sir Thomas Plumer to be clearly specific. In Ashburner *v.* M'Guire, 2 Bro. Ch. Rep. 108, the bequest of the interest of a bond of £3500 for life to B., and the principal at her decease to C.; in Ryder *v.* Wager, 2 P. Wms. 328, the bequest of the residue (after deducting £500) of money owing to the testator by Sir M. H.; in Chaunth *v.* Beech, 4 Vesey, 555, the bequest of £8000, the amount

of a banker's note; in Humphreys v. Humphreys, 2 Cox, 184, the bequest of all the stock possessed by the testator in the 8 per cents., being about £5000; were ruled to be specific legacies, and the receipt of the money by the testator an ademption of the legacy. The cases of Douglass v. Congreve, 1 Keen, 410; Kamp v. Jones, 2 Keen, 736; Davis v. Morgan, 1 Beaver, 259; Hays v. Hays, 1 Keen, 97, further exemplify the same principle. The subject will also be found to have been very fully considered, and the authorities up to that period (1823) examined by Chancellor Kent, in Walton v. Walton, 7 John. Ch. R. 257; in which he held that a bequest of a testator's "right, interest, and property in thirty shares, which he owned in the Bank of the United States," was specific. "A legacy of a debt," says he, "unless there is ground for considering it a legacy of money, and that the security is referred to as the best mode of paying it out of the assets, is as much specific as the legacy of a horse or any moveable chattel whatever. If the specific thing is disposed of or extinguished, the legacy is gone." In Blackstone v. Blackstone, 3 Watts, 335, this doctrine received the consideration of our own Supreme Court, and it was there held that a bequest of "all *my* 250 shares of the capital stock which *I hold* in the Union Bank of Pennsylvania," was a specific legacy, which was extinguished by a sale of the stock in the lifetime of the testator. The words "which I hold" in this bequest, were held by the Court "to individuate the stock as a *corpus*" with sufficient precision to make the legacy clearly specific. This case was one of great apparent hardship to the legatees. It was admitted that the testator sold the stock only from an apprehension of danger of loss upon it; that he took a bond from the purchaser of it for the amount at which he sold it, declaring that the bond should go to the legatees in place of the stock; and that the bond remained wholly unpaid at the death of the testator. But, say the Court, "the legacy being a specific one, whatever was the motive for its extinction or change of being, whether to destroy it or preserve it for the legatees, and whatever be the evidence of such motive, it ceased to have the specific existence ascribed to it in the will, and neither the bond taken as a substitute for it, nor its value, can be demanded of the testator's estate." In the case before us, the legacy is described as "$1000 OF United States 6 per cent. stock or loan of 1812, standing in my name on the books of the loan office, Pennsylvania, as per certificate No. 267." The words "standing in my name" have been held, in Barton v. Cooke, 5 Vesey,

461; Norris v. Harvren, 2 Madd. Ch. Rep. 280; Sleech v. Thorn-
ington, 2 Vesey, Sen. 261; Drinkwater v. Falconer, Ib. 623, as
sufficiently identifying stock bequeathed, so as to make a legacy
of it specific. Beside these words, we have in this case a precise
description of the stock bequeathed, together with a statement of
the number of the particular certificate evidencing it; a minuteness
of description leaving no kind of doubt as to the identity of the
subject-matter of the bequest, intended by the testator to be given
to the legatee.

That a specific legacy of stock which has been sold by a testator
before his death; or of a debt which has been demanded and re-
ceived by him, is adeemed and extinguished, is not disputed. No-
thing remains to which the words of the will can apply. The
intention of the testator is immaterial in the ademption of the
specific legacies, because the subject being extinct at the death of
the testator, there is nothing upon which the will can operate :
Blackstone v. Blackstone, supra.

But it has been strongly urged on us, that this is not a regular
specific legacy, but one in the nature of a specific legacy;—one in
which a given sum of money is bequeathed, with reference to a
particular fund out of which it is to be satisfied; and that this
class of legacies are never held to be adeemed or extinguished by
the sale or other disposition by the testator of the fund from which
payment is to be made previous to his death. That a distinction
does exist, between a bequest of a sum of money referring to a se-
curity or debt for its payment, and a gift of the security or debt
itself, is undoubted, although Lord Thurlow, in Ashburner v.
M'Guire, seemed to have regarded it as a refinement. The leaning
of Courts of Equity is always against regarding a legacy as specific.
The will is always read with an inclination to hold a legacy gene-
ral; and if there is the least opening to imagine the testator meant
to give a sum of money, and referred to a particular fund only, as
that out of which in the first place he meant it to be paid, the lega-
tee will have this advantage, that it shall be considered pecuniary,
so as not to have the legacy defeated by the destruction of the se-
curity : Chaunth v. Beech, 4 Vesey, 565, 566; Ambler, 568. The
same legacies may be specific in one sense, and pecuniary in ano-
ther : specific, as given out of a particular fund, and not out of the
estate at large; pecuniary, as consisting only of definite sums of
money, and not amounting to a gift of the fund itself, or any ali-
quot part of it : Smith v. Fitzgerald, 3 Ves. & Beam. 5. The kind

of legacy alluded to is what is termed in the civil law a demonstrative legacy, that is, a general pecuniary legacy with a particular security pointed out as a convenient mode of payment, where, although such security may be called in or fail, the legacy will not be adeemed.

Of this kind of legacy the case of Kirby *v.* Potter, 4 Vesey, 478, is an example. There a legacy to B. of £100, out of my reduced bank annuities, 3 per cents., "was ruled to be a general and not a specific legacy, Lord Alvanley holding the phrase, £100 out of my reduced bank annuities," meant that the executor should raise £100 by selling so much of that stock. Sibley *v.* Perry, 7 Vesey, 522; Le Quie *v.* Finch, 3 Merivale, 49; Deane *v.* Test, 9 Ves. 146; Fowler *v.* Willoughby, 2 Sim. & Stewart, 358; are cases determined on the same principle. The principle extracted from these cases is, that a sum of money bequeathed out of particular stock, is *prima facie* adjudged a money legacy, but liable to be considered a specific bequest of so much of the identical stock which the testator had, when a clear intention appears upon the whole will. In Barker *v.* Rayner, 5 Madd. Ch. Rep. 217, it is said, that, "when once it is determined that the legacy of a debt is specific and not demonstrative, that the only safe and clear way is to adhere to the plain rule, that there is an end of the specific gift, if the specific thing does not exist at the testator's death."

The judgment of the Court being that this is a specific, and not either a general or demonstrative legacy, we will notice the remaining reasons urged against its being adeemed by the receipt of the money from government. It is said that this receipt by the testator was compulsory and not voluntary, and that the state of the fund was changed by act of law and not by the act of the parties.

At one period a notion certainly prevailed, that although a specific legacy of a debt or security was adeemed, where the testator received the debt specifically bequeathed at his own instance, that it was otherwise where the debt was paid him without his application. The cases of Orme *v.* Smith, 1 Equity Cases Ab. 302; Partridge *v.* Partridge, Cas. Temp. Talb. 228, seem to have been decided on this distinction. This doctrine has, however, been since entirely exploded. See Ford *v.* Fleming, 1 Eq. Cas. Abr. 302, Ambler, 402, and the cases cited in Roper on Legacies, vol. 1, p. 243; see also Walton *v.* Walton, 7 John. Ch. Rep. 265-6. There is no ground, therefore, for a distinction between a voluntary receipt by the testator of a debt specifically bequeathed, and one coerced

by suit or demand. In both cases the legacy of the debt, so far as payment has been made, is extinguished.

There are cases in which the alteration of the fund by mere act or operation of law, has been held not to operate as an ademption of a specific legacy of the fund. Such a case is Partridge v. Partridge, Cases Temp. Talbot, 226. There A. bequeathed to B. £3000, 3 per cent. consols. This fund was afterwards changed by Act of Parliament into one of a different description. The legacy was held not to be adeemed, because the alteration of the fund not being made by the testator but the legislature, the act was not allowed the effect of prejudicing the legatee. Suppose a case in which a legacy is given of stock in a particular bank, naming it; and afterwards by law the name of such bank is changed. This would be such an alteration of the fund by act of law, as would not work injury to the legatee of the stock. But the case before us is not one of this description. There is no alteration of the fund by act of law. The government of the United States owed the testator a debt for the payment of which the public faith was pledged to him. When due it was accordingly paid. This is no more a change of the fund by operation of law, than would be the payment of a bond or other debt owed to the testator, which he had previously specifically bequeathed by his will. The obligation to receive payment from the government, and to release it from further payment of interest, was as much a contract on the part of the testator, as was the engagement of government to pay him interest until the debt matured, and the principal at that time.

The last ground on which the executor of Ludlam is sought to be charged with the payment of this legacy, has certainly nothing to recommend in natural equity. It appears that the executor, on the 19th of February, 1830, filed an account of his trust in the Register's office, charging himself with ten shares United States 6 per cents., par $1000, as held in trust for James Ludlam the legatee. And that on the 27th of April, 1841, he filed a second account, in which he again charges himself with this loan as so held in trust. A copy of this account was transmitted by him to London, accompanied by a letter addressed to the executor of James Ludlam, who is deceased, in which he expresses his readiness and willingness to pay over the amount when required by proper authority.

From these grounds it is insisted that the executor is estopped from denying the claim of the legatee. It is manifest that the executor throughout has acted on the mistaken idea, that the legacy

of the United States loan was not adeemed by its payment to the testator. A natural mistake certainly, seeing we have arrived at a different conclusion only after a laborious investigation. His mistake cannot compromit the rights of the residuary legatee, who is the real party in interest claiming against the alleged specific legatee. The testator's legacies must be paid out of his estate, to those to whom they by law pertain. Not to those to whom the executor supposes they belong. We are now distributing the personal estate of George Ludlam among those to whom *he* has bequeathed it by his will. None others can ask any part of it. If his executor has involved himself in any liability to a party claiming to be a legatee of any part of the estate, whom the law does not recognise as such, the executor may be answerable personally. But surely that can give such a party no claim against the estate of the testator, at the expense of those to whom it rightfully belongs. But it was entirely competent for the executor, when he came before the auditor on his final account, to ask to be discharged from his erroneous credit to James Ludlam, given in his original and final account. The whole account, both as to charge and discharge, comes before an auditor under a reference for settlement, adjustment, and distribution. The executor may be surcharged to any extent the proofs may justify. Why can he not discharge himself by showing clear and manifest overcharges against himself, made through ignorance, inadvertence, or mistake of law or fact? I can see no reason why he should not have this claim to mere justice. It is always a difficult task for an executor to sustain errors alleged to be made against himself in the statement of his accounts. The legal presumption is, that his liability is co-extensive with his own admissions. But when a case does exist, in which an executor can, on a reference of his accounts, show clearly and conclusively that he has by mistake surcharged himself with what he is not legally liable for, or that he has admitted a claim by a legatee which the latter has no right to, we can have no doubt of the right and duty of the auditor to settle and adjust the account before him according to the truth and justice of the case.

The cases cited of Skering *v.* Greenwood, 4 Barn. & Cress. 281; Bramstone *v.* Robins, 4 Bingham, 11; Bresbane *v.* Dacres, 5 Taunt. 143; are cases depending on the well settled principle, that if a person with a full knowledge of facts pays over to another claiming it as a right, money which he was not compellable by law to pay, he cannot, on discovering his error, recover it back, there being no-

thing against conscience in the other party retaining it.   They are all cases where the party seeking to recover back the money, either by way of direct action or set-off, had actually paid the disputed sum over to his opponent under a claim of right.   No case has been, nor do I believe can any be shown, in which it has been held that a party can recover from another money erroneously admitted to be due to the plaintiff; or that, in an action brought on such admission, it is incompetent for the defendant to show that his admission of liability to the plaintiff was founded on a mere mistake as to the legal claim of the latter to the sum demanded.   Suppose, instead of proceeding in this court, the representative of James Ludlam had sued at law under the Act of Assembly authorizing suits to be brought for the recovery of legacies; would the admissions in these accounts, that he held the proceeds of the government loan for the use of Ludlam, have concluded the executor from showing that the legacy had been adeemed and extinguished by the receipt of the loan from government by the testator before his death; and that his admission of liability was predicated on an error in law as to the effect of this payment and receipt ?   I cannot think so.   But in this proceeding, where payment is asked from the fund, and where the effect of admitting the claim would be to take from the residuary legatee what by law belongs to her, and give it to one who has no claim upon it, such a position is clearly inadmissible. The request for an issue is refused, because there is no state of disputed facts requiring it.   The original legacy; the receipt of the subject of the legacy by the testator; the handing over the proceeds to the executor; the retention of it by the executor's banking-house until the testator's death; the payment of interest on it to his widow; the admissions of James Ludlam's right to it in the accounts and correspondence; in short, every fact on which the claim is placed, are clear.   The only question in the case arises as to the principle of law flowing from these facts.   These principles are against the legatee, and in favour of the executor.

The remaining objection arises from the alleged irregularity of the appointment of the auditor.   It is contended that under the provisions of the 47th section of the Act of 1834, and the 1st section of the Act of April 1840, such an appointment can only be made on the application of a legatee, and that the original appointment, being in this case made on the application of the executor, is void.   The literal directions of these laws seem to require all applications to compel the executors to pay and deliver over legacies,

should be made by a legatee or other person interested in a legacy. But, supposing that these laws give an executor no *status* in Court to relieve himself from his trust, by having the claim of legatees ascertained by the decree of the Court, still, I consider, under the circumstances of this case, the objection cannot prevail. After his appointment, the auditor proceeded to settle the account of the executor, and to assign the legacies to the different legatees, and reported the result to the Court. The exceptant did not appear on that occasion. Afterwards, and after the auditor's report was filed, the exceptant applied to the Court for an order directing the report made to be referred back to the auditor. This was accordingly done, and the exceptant appeared before the auditor and litigated his claim, which, after a full hearing, was ruled against him. After this course of procedure, it seems to me too late for the exceptant to complain that the auditor was not appointed on his motion. By this course he adopted the appointment as much as if he had originally moved it. If he had desired to object to the regularity of the appointment of the auditor, his true course was to have moved to quash it. After moving the reference back, and after appearing and presenting the claim to the auditor, it is too late to complain of any alleged defect in the original appointment. Such a course of proceeding is equivalent to an original application to compel payment or delivery of the legacy.

Another circumstance exists in the case, of some importance. Although the counsel who moved the reference did so on the record on behalf of the executor only, yet he also represented the residuary legatee, and now desires, on behalf of this legatee, to validate, so far as his present affirmative action can do so, the proceedings of the auditor. The whole result of vacating our past doings would be to refer the case back again to the same auditor, on the formal application of the residuary legatee, from which no other than the present result could follow. Under all these circumstances, I think, we should not interfere with the original appointment of the auditor.(*a*)

(*a*) An appeal was taken to the Supreme Court in this case, and the decision of the Orphans' Court affirmed, March Term, 1850; but the case has not been reported.